UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ERIC J. COPENHAVER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BAXTER INTERNATIONAL, INC., a corporation, BAXTER HEALTHCARE CORPORATION, a company, LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, a company, JOHN DOE I-X,,<br><br>Defendants. | Case No. 1:19-cv-00079-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment relating to Defendants' discontinuation of short term disability benefit payments. Eric Copenhaver filed this action alleging a violation of Section 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132, and a violation of the Americans with Disabilities Act, 42 U.S.C. § 12111. However, the motions are limited to the ERISA claim. Copenhaver seeks to recover short-term disability benefits, which Defendants refused to extend on the grounds Copenhaver no longer met the definition of disability within the meaning of the Baxter Short-Term Disability Plan.

The Court heard oral argument on June 4, 2020, and took the matter under advisement. For the reasons explained below, the Court will grant Plaintiff's Partial Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

## BACKGROUND

Copenhaver worked for Baxter International, Inc. ("Baxter") in the position of Service Specialist. The position required Copenhaver to, among other duties, deliver and pick up products for kidney dialysis patients and dialysis clinics utilizing a Class B CDL vehicle. AR 138.[1] According to the job description, the position required the ability to drive a CDL vehicle, and the physical capability to hand carry stock. This involved heavy physical work with frequent lifting, and the ability to carry objects weighing 25-37 pounds or more on a repetitive basis, as follows:

> An average delivery consists of 30 cases, at 824 pounds. Each case is lifted from the floor of the truck, or stack, (possibly chest high), and placed on a hand truck, wheeled into a patient's home, then lifted off the hand truck and placed on the floor, or lifted onto an existing stack. In a warehouse 15%. In truck driving 40%. In patients home making deliveries 45%. Hazards include…Pushing and pulling a hand truck loaded (total weight of 165-200 lbs). Some are deadlifts up stairs, into basements, attics, or into a garage. Often requires pulling out an aluminum ramp or liftgate from the truck. Manual lifting of cartons.

AR 138-139. The job requirements included also the ability to pass a physical agility test. AR 139.

---

[1] The Administrative Record is filed at Docket 23, Exhibit A. Rather than docket numbers, the Court will refer to the administrative record page numbers.

**MEMORANDUM DECISION AND ORDER  - 2**

While at Baxter, Copenhaver participated in Baxter's welfare benefit plan, which provided both short term and long term disability benefits administered as The Baxter Short-Term Disability Plan (the STD Plan) and The Baxter Long-Term Disability Plan (the LTD Plan). AR 88 – 131.[2] Baxter is the sponsor of both Plans. AR 128. Liberty Life Assurance Company ("Liberty") is the Plan carrier and claims administrator. AR 129. The plan carrier makes decisions regarding a claimant's eligibility for STD and LTD benefits. AR 102. Upon filing a claim under the STD Plan, the plan carrier reviews the claim, requests information that may be needed, and advises the employee claimant if the claim for benefits is approved or denied. AR 118. The STD Plan is self-insured, meaning benefits are paid by Baxter from Baxter's general assets. AR 102. The plan carrier (Liberty) insures the LTD Plan and makes all payments from the Plan, while Baxter pays premiums to the plan carrier for LTD coverage elected by its employees. AR 102.

The STD Plan will pay benefits, up to 28 weeks, provided the employee continues to meet the definition of total or partial disability. AR 95. The STD Plan defines disability as follows:

> To be considered disabled under the STD Plan because of an injury, illness, or pregnancy, you must:
> • be continuously unable to perform the substantial and material duties of your current job on a full time basis (your regular pre-disability work schedule); and
> • be under the regular care of a licensed physician (other than a family member or yourself, if you are a physician).

---

[2] The Baxter Short-Term Disability Plan and The Baxter Long-Term Disability Plan are component parts of a larger plan whose official name is the Baxter International Inc. and Subsidiaries Welfare Benefit Plan for Active Employees (the "Welfare Benefit Plan"). AR 129. The Welfare Benefit Plan is subject to ERISA. AR 130.

**MEMORANDUM DECISION AND ORDER - 3**

> To be eligible for STD benefits, you must file a completed telephonic or internet claim. Your physician also must provide substantial objective medical information or clinical findings with your medical treatment to support the disabling condition.

AR 103. An injury is defined as "any accidental bodily injury that results (directly and independently of all other causes) in a disability." AR 103.

Additional provisions contained within the STD Plan inform the claimant that the plan will pay "benefits only if you are under the care of a licensed physician (other than a family member or yourself, if you are a physician). In addition, the plan carrier may require independent medical examinations or testing as evidence of your disability. The STD Plan may pay for the expense associated with these required examinations or testing." AR 104.

Coverage under the STD Plan ends the day the claimant no longer meets the eligibility criteria. AR 123. Benefits will also end if:

> You are no longer able to provide sufficient medical evidence of your disability;
> . . . .
> You refuse to follow your treatment plan or a rehabilitation program;
> . . . .
> You cease to be under the care of a licensed physician (other than a family member or yourself, if you are physician) . . . .

AR 105.

On July 22, 2017, Copenhaver submitted a claim for short term disability benefits for chronic pain in his shoulders limiting his range of motion, and impairing his ability to lift and carry. AR 91, 407, 595. On July 26, 2017, Liberty acknowledged receipt of

**MEMORANDUM DECISION AND ORDER - 4**

Copenhaver's application. Thereafter, Liberty contacted Copenhaver's physicians, and obtained information about Copenhaver's medical condition and prognosis. AR 595. Based upon the medical information received, Liberty approved Copenhaver's request for STD benefits, and he began receiving benefits as of August 1, 2017. AR 132. Liberty extended benefits through December 4, 2017, at which time Liberty denied further extension of Copenhaver's STD benefits on the grounds he no longer met the definition of disability under the terms of the Plan. AR 487, 397 - 400. Copenhaver appealed the termination of benefits decision on January 25, 2018, and on March 9, 2018, Liberty affirmed its denial of continued benefits. AR 407 – 411. Copenhaver filed a second level appeal on June 21, 2018. AR 132. Baxter denied the appeal on September 20, 2018. AR 132 – 137. This suit followed.

### A.    Copenhaver's Medical Condition

In granting STD benefits through December 4, 2017, Liberty relied upon medical records obtained from Copenhaver's treating providers. On August 29, 2017, Liberty approved benefits through September 30, 2017, "based upon your inability to perform your job." AR 533. Liberty at that time had received treatment records from FNP Jeff Robbins of Primary Health; PA Cline; Dr. Strickland, a chiropractor; and Dr. Hessing, an orthopedist, which records are summarized below.

Chart notes from FNP Jeff Robbins of Primary Health, dated May 19, 2017, documented  findings upon examination of painful and limited range of motion secondary to pain in the shoulders bilaterally; diminished strength bilaterally due to pain; and tenderness of the subdeltoid bursa and bicipital tendon upon palpitation. AR 563.

**MEMORANDUM DECISION AND ORDER  - 5**

Robbins directed Copenhaver to continue treatment with pain medication and referred him to Dr. Hessing, an orthopedist. AR 565.

PA Cline examined Copenhaver on July 11, 2017. AR 558. Based upon her examination findings, PA Cline advised that Copenhaver was not to lift, push, or pull over 25 pounds, and he was not to reach above or below shoulder level. She restricted him to light duty, defined as lifting and carrying up to only 20 pounds occasionally. Her treatment plan included physical therapy, and she prescribed Ibuprofen and Flexeril. AR 558. The physical restrictions were imposed through July 25, 2017. AR 558.

Dr. Hessing treated Copenhaver between December 12, 2016, and August 7, 2017, for bilateral rotator cuff impingement. AR 560. Examination findings revealed limited motion and pain on shoulder exam, and x-ray revealed subacromial calcium deposits. AR 560. Dr. Hessing restricted Copenhaver to medium work, which would allow for lifting and carrying up to 50 pounds occasionally, but clarified that Copenhaver was not to reach overhead, and that he could not reach behind his back with his left arm. Dr. Hessing indicated the restrictions were to be imposed for two weeks starting August 7, 2017. AR 560.

Dr. Strickland treated Copenhaver between September 27, 2013, and August 7, 2017. AR 540.[3] Physical examination findings included painful and restricted bilateral shoulder active range of motion. Dr. Strickland limited Copenhaver to light duty, with

---

[3] The form Dr. Strickland completed indicates a "date first treated" of September 27, 2013. AR 540. However, no records from that period were part of the Administrative Record.

**MEMORANDUM DECISION AND ORDER  - 6**

only occasional bending, lifting, pushing and pulling of up to 20 pounds. These restrictions were imposed from August 15, 2017, through September 30, 2017. AR 540.

Prior to the discontinuation of benefits on September 30, 2017, Liberty obtained additional information from treating providers Drs. Timothy E. Doerr, James Bates, and James Whitaker, D.O. AR 500 – 511; 522 – 531. Dr. Doerr, an orthopedist, evaluated Copenhaver on August 10, 2017. AR 519 – 521. Examination results revealed 4/5 strength in the left deltoid compared to 5/5 on the right, which was limited by left shoulder pain and stiffness. The right shoulder retained full forward flexion and abduction, associated with pain and impingement, while the left shoulder exhibited limited flexion, and stiffness. A neurologic exam revealed paresthesias in the left and right ulnar nerve distributions. AR 519. Dr. Doerr diagnosed right shoulder impingement/possible anterior subluxation; left shoulder adhesive capsulitis; and cubital tunnel syndrome. AR 520. Dr. Doerr indicated that Copenhaver's left shoulder adhesive capsulitis would require "an extensive period of therapy to include moist heat with gentle passive and active range of motion," which could either be performed by Dr. Strickland or a referral to physical therapy. AR 520.

Dr. James Bates, a neurologist, conducted an electrodiagnostic study of Copenhaver's right and left ulnar nerves on August 23, 2017. AR 517. The examination revealed slowing of the ulnar nerve conduction velocity at the elbow, indicating bilateral ulnar neuropathy/cubital tunnel syndrome. AR 517. Dr. Doerr restricted Copenhaver to light duty, with no lifting greater than 20 pounds, no repetitive overhead work, and no

**MEMORANDUM DECISION AND ORDER  - 7**

repetitive elbow flexion. AR 516. Restrictions were imposed from August 10, 2017, to

September 28, 2017. AR 516.

Beginning in September of 2017, Copenhaver sought treatment from James

Whitaker, D.O., of Idaho Joint and Spine. AR 500 - 511. September 20, 2017 chart notes

indicate Dr. Whitaker diagnosed bilateral adhesive capsulitis, and his treatment plan

included a home exercise program, a trial of "OMM,"[4] and pain medications. AR 511.

On September 27, 2017, Dr. Whitaker administered bilateral deltoid trigger point

injections. AR 509. On October 4, 2017, Dr. Whitaker noted Copenhaver reported

improvement after receiving trigger point injections, but that his pain returned. AR 503.

Dr. Whitaker's treatment plan was to have Copenhaver's primary care physician

"continue to write for his pain medications, but I may take this over if he need[s] to

increase his dose….I will provide a [home exercise program] for tennis elbow." AR 504.

Dr. Whitaker advised Copenhaver to ice "as needed and as tolerated." AR 504. On

October 11, 2017, Dr. Whitaker assumed responsibility for prescribing pain medications,

and prescribed Lyrica, hydrocodone, and Zohydro. AR 502.

Based upon the records from Drs. Doerr, Bates, and Whitaker, on October 19,

2017, Liberty extended benefits for Copenhaver's STD claim through November 1, 2017.

AR 498. Liberty advised Copenhaver that it may need additional medical information

from his treating providers if his time out of work needed to be extended beyond

November 1, 2017. AR 497- 498. Copenhaver was advised also that: "Lack of sufficient

---

[4] Defendants state that OMM, or Osteopathic Manipulative Medicine, is "akin to chiropractic
care." (Dkt. 23-8 at 4.)

**MEMORANDUM DECISION AND ORDER  - 8**

medical evidence in support of your claim may result in the denial of further benefits."
AR 497.

Prior to Liberty's next records review, Liberty received an update from Dr.
Whitaker and an independent paper review from a reviewing physician. Dr. Whitaker's
treatment notes dated October 25, 2017, indicate Copenhaver "has been continuing his
HEP,"[5] and taking Zohydro 30 mg. every 12 hours. AR 493. Copenhaver reported his
right arm pain has been worse, while his left arm pain has been about the same. AR 493.
Copenhaver rated his pain that day as a 1 on a 10 point scale, but reported it was as high
as a 9, and averaged 3. AR 494. Physical examination results yielded pain upon
palpitation. AR 494. Dr. Whitaker diagnosed "bilateral adhesive capsulitis in the
shoulders with trigger points at the right wrist extensors muscles….He is in the freezing
phase which will later be in the thawing phase and his pain will then decrease. The
natural history of this process takes 18-24 months total. Take Ibuprofen pm. Continue
HEP for tennis elbow." AR 494. Dr. Whitaker also included a work restriction, "to
include no lifting overhead. No lifting greater than 20 lbs.," and expected to follow-up
with Copenhaver on or before December 10, 2017. AR 494.

Dr. Gale Brown, Jr., a Board Certified Physical Medicine and Rehabilitation
specialist, reviewed all treatment records then in Liberty's possession and prepared a
report dated November 7, 2017. AR 489-490. Dr. Brown concluded that a review of the
medical documentation to date "appears to support impairment due to left shoulder

---

[5] Records abbreviate "home exercise program" as "HEP." (Dkt. 23-8 at 4.)

**MEMORANDUM DECISION AND ORDER - 9**

adhesive capsulitis, right shoulder impingement, and possibly cubital tunnel syndrome. Diagnostic work-up, treatment, and treatment compliance appear to be suboptimal." AR 489. Specifically, Dr. Brown commented that treatment had been limited to medications, "with no confirmation of any PT, injection, or surgery. No imaging has been done other than x-rays." AR 489. Dr. Brown recommended that a full review be conducted by a "CP" (certified physician) in Orthopedics or "PM&R" (physical medicine and rehabilitation) to establish the severity and scope of impairment, as well as an appropriate treatment plan and return to work plan. AR 489.

Based upon the recent records received from Dr. Whitaker and the file review conducted by Dr. Brown, on November 10, 2017, Liberty extended benefits through December 4, 2017. AR 487. Liberty again stated that "additional written medical documentation will be required to support your claim of continuing disability. Lack of sufficient medical evidence in support of your claim may result in the denial of further benefits." AR 487.

After approving the extension of benefits, Liberty sent its file to review for a second opinion. AR 483. Dr. C. David Bomar, a board certified orthopedic surgery consultant, prepared a report dated November 19, 2017. AR 483. In Dr. Bomar's opinion, "there is no indication that [Copenhaver] has been attending physical therapy which would be the primary treatment for adhesive capsulitis." AR 483. Dr. Bomar commented that, "[t]reatment has been medications and trigger point injections. There has been no reported physical therapy, which should be the main treatment for adhesive capsulitis." AR 484. He noted also the lack of MRI scans, or an assessment of range of motion, and

**MEMORANDUM DECISION AND ORDER  - 10**

that treatment was limited to home exercise. AR 484. Dr. Bomar concluded "[t]he

reasons for continued impairment without appropriate treatment of the shoulders are not

found in the records." AR 484. While he acknowledged Dr. Whitaker's work restrictions

limited Copenhaver to lifting no more than 20 pounds and no overhead lifting, in his

opinion the medical records to date "do not support any work restrictions beyond"

October 24, 2017. AR 483.

Dr. Bomar noted also that, while Copenhaver had undergone EMG testing which

revealed evidence of cubital tunnel syndrome, no treatment had been directed at this

diagnosis. AR 483. Dr. Bomar concluded that possible impairment from cubital tunnel

syndrome was not supported from the available records. AR 483.

Later, Dr. Bomar contacted Dr. Whitaker, which conversation was summarized by

Dr. Bomar in a letter to Liberty dated November 21, 2017. AR 482. Dr. Bomar noted that

Dr. Whitaker "did not have a firm opinion regarding the claimant's work capacity such as

lifting and reaching," and that Dr. Whitaker's findings were "largely subjective." AR

482. Dr. Bomar stated that Dr. Whitaker recommended a functional capacity exam to

determine work capacity. AR 482. Dr. Bomar indicated his conversation with Dr.

Whitaker "does not alter the conclusions in my initial report." AR 481.

### B. Discontinuation of Benefits and Appeals

Copenhaver was advised by telephone on December 1, 2017, that his STD benefits

would not be extended beyond December 4, 2017. AR 427. When Copenhaver asked

about obtaining a functional capacity examination, the claims administrator explained,

"we don't direct care." AR 427. In a follow-up telephone call on December 4, 2017,

**MEMORANDUM DECISION AND ORDER - 11**

Copenhaver was advised that his medical records "are not supporting a severity of [diagnosis] or [treatment] plan that would indicate support for ongoing" disability. AR 426. When Copenhaver asked what he should do, he was advised about his appeal rights and to follow up "with APS[6] directly to confirm what they are recommending for his ongoing [treatment]." AR 426. Copenhaver was told to include information from APS with his appeal. AR 426.

Liberty's letter explaining its reason for discontinuing benefits as of December 4, 2017, stated:

> The available records do not show support for any work restrictions beyond the current approved through date of December 4, 2017. There is no indication that you have been attending physical therapy, which would be the primary treatment for your diagnosis. Additionally, there is no indication that any doctors have prescribed a treatment plan relative to your additional diagnosis of Cubital Tunnel Syndrome; this would indicate that this additional condition is not causing any disabling symptoms.
>
> Based on the medical documentation received in relation to the requirements of your job, you no longer meet the definition of disability….

AR 476 - 478. The letter stated that, to be found disabled, Copenhaver must:

> 1. be continuously unable to perform the substantial and material duties of your current job on a full time basis (your regular pre-disability work schedule);
> 2. be under the regular care of a licensed physician (other than a family member or yourself, if you are a physician); and
> 3. not be gainfully employed in any occupation for which you are or become qualified by education, training, or experience.

---

[6] It is not clear from the record what APS refers to.

**MEMORANDUM DECISION AND ORDER  - 12**

AR 476-77.[7] Liberty explained that, "[b]ased on the medical documentation received in relation to the requirements of your job, you no longer meet the definition of disability outlined above. Thus, benefits are no longer payable and we must close your claim." AR 478.

In his January 25, 2018 appeal letter to Liberty, Copenhaver included additional treatment notes from Dr. Whitaker dated December 5 and 21, 2017. AR 459 – 468. Dr. Whitaker's treatment notes indicate Copenhaver reported performing his HEP "multiple times per day," "6 days per week." AR 467, 489. Copenhaver reported also that he was continuing to take Ibuprofen, Lyrica, and Zohydro for pain. AR 467. Dr. Whitaker noted that "physical therapy and/or GH steroid injections would not be significantly beneficial." AR 468. In Dr. Whitaker's opinion, the healing process would take 18–24 months total. AR 468.

Dr. Whitaker continued Copenhaver's treatment plan, which consisted of medication management, and imposed work restrictions "to include no lifting overhead or chest high lifting. No repetitive lifting greater than 20 lbs. A complete functional capacity [exam] may be helpful to fully evaluate his abilities….He is not able to perform the substantial and material duties of his job because of his pain and decreased bilateral shoulder range of motion." AR 468. Dr. Whitaker recommended a right shoulder MRI arthrogram, but noted Copenhaver did not have the financial means to obtain the

---

[7] The Court notes that the STD Plan does not include provision number three in its definition of disability.

imaging. AR 468. The next follow-up appointment was to occur prior to February 8, 2018. AR 468.

Liberty sent its file, along with the additional documents Copenhaver submitted with his appeal letter, to disability nurse case manager Katelyn Sanborn, who reviewed the file on February 23, 2018 AR 424, 451. Sanborn concluded Copenhaver:

> [H]as had sub-optimal treatment for his reported bilateral frozen shoulders and currently continues a home exercise program and medications and recently declined MRI arthrogram imaging. Per the Mayo Clinic treatment for frozen shoulder includes medications, therapy, steroid injections, joint distention, shoulder manipulation and surgery {as a last resort and is rare}. It is notable that the claimant has not undergone any escalation in care and/or change in treatment aside from his home exercise plan and Motrin as needed which shows a lack of severity, consistency, frequency, or intensity of symptoms.

AR 424.

Liberty's March 9, 2018 letter denying Copenhaver's appeal relied upon Sanborn's evaluation, citing Sanborn's opinion that Copenhaver had received sub-optimal treatment for his bilateral frozen shoulder. Liberty concluded that:

> [T]he information does not contain physical examination findings, diagnostic test results, or other forms of medical documentation to verify that your symptoms were of such severity, frequency and duration that they rendered you unable to perform your duties as a Service Specialist beyond December 4, 2017….our position remains that proof of your continued disability in accordance with the Plan provisions after December 04, 2017 has not been provided. Therefore, no further benefits are payable.

AR 446.

**MEMORANDUM DECISION AND ORDER  - 14**

Copenhaver's second level appeal, submitted to Baxter, included treatment notes from Dr. Whitaker dated February 8, 2018, and a Disability and Impairment Examination Report from Dr. James H. Bates, a specialist in physical medicine, who performed an independent medical evaluation on June 4, 2018. AR 417, 422. Dr. Whitaker noted Copenhaver was continuing his home exercise program with no improvement in range of motion, and he was now incorporating weights and cardio into his exercise regimen. AR 371. Despite some improvement reported following a massage, "everything remains the same." AR 371. Dr. Whitaker planned to schedule Copenhaver for repeat trigger point injections. AR 485.

Dr. Bates concluded that Copenhaver suffered from an 8% whole person impairment. AR 418. Dr. Bates provided the following assessment of Copenhaver's work-related abilities:

> Due to the prominent restrictions in the range of motion of [Copenhaver's] shoulders, there are activities which he is unable to perform. The restrictions then would include:
> - No lifting above chest level
> - Lifting between waist and chest level 25 pounds
> - No restriction of lifting knee to waist level in activities such as side carry.
> - Limit pushing and pulling at chest level to five pounds each upper extremity.
> - Pushing and pulling between waist and chest level, maximum of 50 pounds, depending on the angle and positioning of the strain of pushing and pulling.
> - The reaching and positioning of hands above shoulder/head level on a rare occasion without lifting.
> - Limit the flexion and extension of the elbows, as well as pronation and supination of the forearm to occasional frequency.

**MEMORANDUM DECISION AND ORDER - 15**

AR 418-419.

Of note, Dr. Bates indicated that "physical therapy is the foundation or corner stone for the adhesive capsulitis. Aggressive and frequent physical therapy should be utilized and then depending on the result or response to aggressive physical therapy, then [sic] other treatment options can be added." AR 419. Dr. Bates suggested that "[i]t would be appropriate to begin physical therapy for aggressive soft tissue release and range of motion active assisted, and passive range of motion. A short trial of injections may be appropriate…." Nonetheless, in Dr. Bates' opinion, Copenhaver had reached "a point of medical stability if no further or more aggressive treatment is pursued. Therefore, the impairment as previously listed would be appropriate unless aggressive treatment is pursued." AR 419.

As part of its second level appeal evaluation, Baxter sent its file out for further review to MLS National Medical Evaluation Services. AR 401. On July 11, 2018, Dr. Johnathan Goss, a board certified orthopedic surgeon, provided a report based upon his independent analysis of the medical records and information. AR 401 – 403. Dr. Goss opined that Copenhaver did not meet the definition of disability under the STD Plan for the period of December 4, 2017, through February 4, 2018. AR 403. Dr. Goss cited the following as support for his opinion: (1) Copenhaver's reports of mild pain; (2) no history of trauma; (3) lack of documentation of effectiveness, as well as failure of treatment modalities used, which include medication management, adjustments, multi-band laser treatments, acupuncture, chiropractic care, trigger point injections, and Prolozone injection; and (4) lack of office visit reports from December 22, 2017, to February 4,

2018, to determine the consistency of Copenhaver's shoulder condition. AR 404. Dr. Goss concluded that Copenhaver did not meet the definition of disability under the STD Plan because the clinical information in the medical records did "not reveal the severity of the claimant's condition that would preclude [him] from his job duties of lifting 25-37 pounds frequently." AR 404.

On September 20, 2018, Baxter's Administrative Committee notified Copenhaver that it upheld the prior decision to terminate Copenhaver's benefits under the STD Plan, because Copenhaver's condition "did not meet the Plan's definition of 'disability' for the period beyond December 4, 2017." AR 132. The written determination stated that Copenhaver did not meet the definition of disability, because: (1) he had not provided records of regular, appropriate, effective treatment for his condition; (2) there was no evidence of formal physical therapy, despite recommendations from several providers that physical therapy be pursued; (3) no diagnostic tests were performed to confirm Copenhaver's self-reported symptoms; and (4) Copenhaver reported mild pain. AR 136. Therefore, the committee concluded the evidence provided was "not sufficient to establish that the severity of Mr. Copenhaver's condition precluded him from performing his job duties after December 4, 2017." AR 136.

## DISCUSSION

### 1.   Standard of Review

The Court reviews a plan administrator's denial of benefits "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

MEMORANDUM DECISION AND ORDER  - 17

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a plan gives the administrator discretion to determine eligibility for benefits or to construe the terms of the plan, the Court reviews a denial of benefits for an abuse of discretion. *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009). Whether an administrator abused its discretion is a question of law, not fact. *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009). A motion for summary judgment brought in an ERISA matter is "the conduit to bring [that] legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

The manner in which the Court applies the abuse of discretion standard depends on whether the administrator has a conflict of interest. *Montour*, 588 F.3d at 629. In the absence of a conflict, judicial review of a plan administrator's benefits determination involves a straightforward application of the abuse of discretion standard. *Id.* The plan administrator's decision can be upheld if it is "grounded on any reasonable basis." *Id.* at 630. In other words, if there is no risk of bias on the part of the administrator, the existence of a "single persuasive medical opinion" supporting the administrator's decision can be sufficient to affirm the decision to deny benefits, so long as the administrator does not construe the language of the plan unreasonably or render its decision without explanation. *Id.*

But, if the same entity that funds an ERISA benefits plan also evaluates claims, the plan administrator faces a structural conflict of interest. Because it is also the insurer, benefits are paid out of the administrator's own pocket. By denying benefits, the

**MEMORANDUM DECISION AND ORDER - 18**

administrator retains money for itself. *Id.* Application of the abuse of discretion standard therefore requires a more complex analysis. *Id.* (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) ("[T]he existence of a conflict of interest is relevant to how a court conducts abuse of discretion review." (emphasis added)). In such a case, it is not enough for there to be some evidence to support the plan administrator's decision; the Court must consider the administrator's conflict of interest as a factor in the analysis. *Id.* (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 113 (2008); *Abatie*, 458 F.3d at 968–69.) "[T]he significance of the factor will depend upon the circumstances of the particular case." *Metro. Life Ins. Co.*, 554 U.S. at 108.

In this case, the Court reviews Defendants' decision to terminate benefits under the abuse of discretion standard. Here, an Administrative Committee, which in turn is appointed by the Compensation Committee of Baxter's Board of Directors, is designated as the Plan Administrator. AR 67 – 68, 128. The Plan grants the Administrator "full discretionary authority and power to interpret and administer the Plan in all of its details and to make factual determinations, subject to applicable requirements of law." AR 69. This authority includes the power to determine all questions arising under or in connection with the Plan. AR 69. In addition, the Plan gives the Administrator power to delegate to a Claims Administrator the right and discretion to make determinations as to claims. AR 69. Liberty is designated as the Plan Carrier and Claims Administrator for the Baxter STD and LTD Plans. AR 129.

However, there is a structural conflict of interest present, because Baxter self-insures the STD Plan and is involved in the review process. Baxter is insulated somewhat

because Liberty, the plan carrier, makes the initial benefits decision and the decision

upon first level appeal. AR 118, 120. This aspect of the Plan decreases the Plan's

structural conflict of interest because, while the STD Plan is employer funded, a third

party determines eligibility for benefits and decides the first level appeal. *See, e.g., Burke*

*v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1027 (9th Cir. 2008)

(finding plan created less of a structural conflict when benefits were paid from the plan's

trust, and not directly by employer). Nonetheless, Baxter operates in a dual role when a

second level appeal is filed, as was filed by Copenhaver. At that level, Baxter both

evaluates the claim for disability benefits and is responsible for paying the claim.

When weighing the conflict of interest, the Court must look for "evidence of

malice, of self-dealing, or of a parsimonious claims-granting history." *Abatie*, 458 F.3d at

968. The Court of Appeals for the Ninth Circuit has explained the nature of this analysis:

> We weigh such a conflict more or less heavily depending on
> what other evidence is available. We view the conflict with a
> low level of skepticism if there's no evidence of malice, of
> self-dealing, or of a parsimonious claims-granting history.
> But we may weigh the conflict more heavily if there's
> evidence that the administrator has given inconsistent reasons
> for denial, has failed adequately to investigate a claim or ask
> the plaintiff for necessary evidence, or has repeatedly denied
> benefits to deserving participants by interpreting plan terms
> incorrectly.

*Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 868 (9th Cir.

2008) (internal quotations, citations, and alterations omitted). The Court must therefore

consider how much to weigh the conflict when determining whether there is an abuse of

discretion. *Firestone*, 489 U.S. at 115.

**MEMORANDUM DECISION AND ORDER - 20**

Baxter acknowledges the existence of a conflict of interest, but argues it should be given little weight because there is no evidence that the conflict affected the discontinuation of benefits. (Dkt. 28 at 3.) Copenhaver, on the other hand, argues that in cases involving other plan participants,[8] Baxter has exhibited bias, and has a habit and practice of ignoring the medical opinions of a plan beneficiary's treating physicians. He further asserts that Liberty had a vested interest in discontinuing Copenhaver's STD benefits, because Liberty would be responsible to pay LTD benefits in the future if STD benefits were not discontinued. Therefore, Copenhaver urges the Court to consider Baxter's decision to discontinue benefits with a high degree of skepticism.[9]

While the Court may consider "a parsimonious claims-granting history" in determining whether a plan administrator abused its discretion, *Abatie*, 458 F.3d at 963, Copenhaver presents only past cases decided by other courts where Baxter evidently showed instances of bias. But, "a handful of judicial decisions criticizing specific case outcomes does not establish a history of bias." *Nolan v. Heald Coll.*, 745 F. Supp. 2d 916, 924 (N.D. Cal. 2010). It may be that certain procedural deficiencies, such as a failure to

---

[8] Copenhaver cites to the decisions in the following cases: *Willis v. Baxter Int'l., Inc.*, 175 F.Supp.2d 819, 832 (W.D.N.C. 2001); *Johnson v. Baxter Healthcare Corp.*, No. CV 05-357 JH/RLP, 2006 WL 8443620, at *5 (D.N.M. Oct. 27, 2006); *Sizemore v. Baxter Healthcare Corp.*, No. 05-3030, 2007 WL 900635, at *9 (W.D. Ark. Mar. 26, 2007); *Sotak v. Baxter Healthcare Corp.*, No. 10CV0246, 2010 WL 3303818, at *10 (W.D. Pa. Aug. 20, 2010).

[9] Copenhaver argues also that the Court should conduct a de novo review. But the existence of a conflict of interest does not mandate a change in the standard of review from deferential to de novo. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). Rather, the Court is to apply a deferential standard of review to the discretionary decision-making of a conflicted fiduciary, while at the same considering the conflict when determining whether the fiduciary, substantively or procedurally, has abused his or her discretion. *Id.*

**MEMORANDUM DECISION AND ORDER - 21**

look at contrary Social Security Administration determinations, were a matter of company policy—and thus could show a history of bias—but there is no evidence of a company-wide policy supporting such an assumption here. S*ee, e.g., Sizemore* 2007 WL 900635 at *10 (faulting insurer in that case for failing to consider disability determination by SSA); *Nolan*, 745 F. Supp. at 930 (considering statistical evidence that outside reviewers made medical recommendations in the insurer's financial interest warranted skepticism of insurer's decision to terminate benefits).

In this case, Copenhaver has not presented "material, probing evidence beyond the mere fact of the apparent conflict, that tends to show that the administrator's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Holl v. Amalgamated Sugar Co*. LLC, No. 1:13-CV-00231-CWD, 2014 WL 1672873, at *8 (D. Idaho Apr. 28, 2014) (quoting *Sabatino v. Liberty Life Assur. Co. of Boston*, 286 F.Supp.2d 1222, 1230 (N.D. Cal. 2003)). Accordingly, Baxter's decision to discontinue Copenhaver's STD benefits is reviewed for abuse of discretion, albeit with some skepticism given the structural conflict of interest and Baxter's role in the second level appeal process.

## 2.    Extra Record Evidence

Copenhaver asks the Court to consider evidence outside the Administrative Record. (Dkt. No. 24.) He has introduced Defendants' responses to requests for admission and asks the Court to take judicial notice of decisions from other jurisdictions involving similar Baxter disability plans. (Dkt. 24 at 7-8, 16; Dkt. 24-3, Ex. A.) When the Court reviews a denial of benefits under an abuse of discretion standard, its review

generally should be limited to the administrative record. *Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1041 (9th Cir. 2014) (citation omitted). The administrative record is made up of the evidence considered by a plan administrator in reaching its claim determination. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006). There is an exception, however, that allows the Court to consider extrinsic evidence for the purpose of deciding "the nature, extent, and effect on the decision-making process of any conflict of interest." *Id*.

In this case, and in the exercise of its discretion, the Court finds that the extra-record evidence proffered by Copenhaver will not assist the Court in determining the nature, extent, and effect of any conflict of interest on the decision-making process. Liberty, and in turn Baxter, were required to examine the evidence received from Copenhaver and his medical providers. Defendants' responses to discovery requests, which occurred after litigation ensued, are not germane to the review process. And decisions in other cases, while perhaps persuasive, do not dictate the Court's review of the Plan terms in this matter. The Court will, therefore, confine its analysis to the documents contained within the Administrative Record

Turning to its analysis, the evidence supports a finding that Defendants abused their discretion in discontinuing Copenhaver's STD benefits, as explained below.

## 3.    Analysis

In reviewing for an abuse of discretion, a plan administrator's decision "will not be disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (internal quotation marks and citation omitted). In determining the reasonableness of the

administrator's decision, the Court must consider "all the circumstances before it," rather than considering factors which support the administrator's decision "in isolation." *Pac. Shores Hosp.*, 764 F.3d at 1042. Relevant factors "include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts 'with all of the relevant evidence[,]' and whether the administrator considered a contrary [Social Security Administration] disability determination, if any." *Montour*, 588 F.3d at 630 (citation omitted).

To find an abuse of discretion, the Court must have a "definite and firm conviction that a mistake has been committed and…may not merely substitute [its] view for that of the fact finder." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (citation omitted). "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005).

Here, the parties dispute whether Liberty, and in turn Baxter, appropriately construed the provisions of the STD Plan defining disability. When considering questions of insurance policy interpretation under ERISA, federal courts apply federal common law. *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002). Under the federal common law of ERISA, the courts "interpret terms in ERISA insurance policies in an

**MEMORANDUM DECISION AND ORDER  - 24**

ordinary and popular sense, as would a person of average intelligence and experience." *Id*. "When disputes arise as to the meaning of one or more terms, we first look to the explicit language of the agreement to determine the clear intent of the parties." *McDaniel v. Chevron Corp*., 203 F.3d 1099, 1110 (9th Cir. 2000); *see also Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1113 (9th Cir. 2001) (examining the language of an ERISA plan first to determine whether its terms were unambiguous). The interpretation of an insurance policy is a question of law, and any ambiguities in the plan are construed against the insurer. *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990); *Kunin v. Benefit Trust Life Ins. Co*., 910 F.2d 534, 539 (9th Cir. 1990).

The Court must uphold the administrator's decision "if it is based upon a reasonable interpretation of the plan's terms and was made in good faith." *Estate of Shockley v. Alyeska Pipeline Ser. Co*., 130 F.3d 403, 405 (9th Cir.1997). However, the Court finds these conditions are not met here. Under an abuse of discretion standard of review, and even eyeing Baxter's determination to discontinue benefits with low skepticism, Liberty, and later Baxter, construed the provisions of the Plan in a manner contrary to its plain language.

Liberty's December 4, 2017 letter discontinuing Copenhaver's STD benefits stated he no longer met the definition of disability, because "available records do not show support for any work restrictions." Liberty cited three reasons in support of its conclusion: (1) there was no reported physical therapy, and no attendance at physical therapy, which is the primary treatment for the diagnosis of adhesive capsulitis; (2) the

**MEMORANDUM DECISION AND ORDER - 25**

reasons for continued impairment "without an escalation of care in treatment would indicate the symptoms are not to a degree that would warrant ongoing restrictions and limitations"; and (3) the medical documentation received in relation to the requirements of the job indicates that Copenhaver no longer met the definition of disability.

Under the terms of the STD Plan, Copenhaver was considered disabled due to an injury or illness if: (1) he was continuously unable to perform the substantial and material duties of his current job on a full time basis; and (2) he was under the regular care of a licensed physician. The Court finds Liberty's stated reason for discontinuation of STD benefits does not implicate the second criterion, because Liberty relies solely upon Copenhaver's abilities and limitations.[10] Thus, only the first criterion is at issue.

### A.    No Reported Physical Therapy

Under a plain reading of the Plan terms, a claimant may be unable to perform his or her job duties and, although disabled, Liberty may discontinue benefits if a claimant fails to follow a treatment plan or rehabilitation program. Liberty's first stated reason for termination of benefits cites the lack of "physical therapy," which Dr. Bomar, Liberty's second reviewing physician,[11] considered was the "primary treatment" for Copenhaver's condition. But the Plan does not contain an optimal standard of care provision or otherwise specify a standard of care. Rather, the Plan simply states that there must be a refusal to follow "your treatment plan or a rehabilitation plan." (emphasis added), not any specific treatment plan or optimal treatment plan.

---

[10] Nor did Defendants raise this issue in their motion.
[11] Dr. Bomar's report was dated November 19, 2017.

Here, medical records in Liberty's possession prior to December 4, 2017, indicated Dr. Whitaker had established a treatment plan, consisting of pain medication; a home exercise program; trigger point injections; ice therapy; and osteopathic manipulation. Although Dr. Whitaker's last treatment note reviewed by Dr. Bomar was dated October 25, Liberty was aware that follow-up care was scheduled with Dr. Whitaker on or before December 10, 2017. Dr. Whitaker's records establish Copenhaver was performing his home exercises and visiting the doctor's office at regular intervals. There is no evidence Copenhaver "refused to follow" the treatment plan Dr. Whitaker had prescribed.[12] And, while disability plans may contain an optimal treatment requirement,[13] the STD Plan here does not.

### B.    Escalation of Care in Treatment

It is not clear why Liberty concluded that an escalation of care in treatment is necessary to sustain a finding that Copenhaver was continuously unable to perform the substantial and material duties of his current job on a full time basis. Liberty had approved payment of STD benefits to Copenhaver since August 1, 2017, which indicates

---

[12] At most, the record reflects that, on December 1, 2017, Copenhaver admitted to "occasionally doing exercise at home." AR 427.

[13] For example, some disability policies require that a claimant receive a certain level of care. In *Holifield v. UUM live Ins. Co. of Am.*, 640 F.Supp.2d 1224 (C.D. Cal. 2009), an individual claiming disability under the terms of the plan was required to "personally visit a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat [his or her] disabling condition(s); and [receive] the most appropriate treatment and care which conforms with generally accepted medical standards, for [his or her] disabling condition(s) by a physician whose specialty or experience is the most appropriate for [his or her] disabling condition(s), according to generally accepted medical standards."

**MEMORANDUM DECISION AND ORDER  - 27**

that, based on available medical records, Liberty determined Copenhaver was unable to meet his job requirements. The medical records received prior to December 4, 2017, indicate Copenhaver's condition would take considerable time to improve, possibly up to 18 months. Dr. Whitaker's treatment notes from October 25, 2017, continued to impose work restrictions prohibiting lifting greater than 20 pounds. Dr. Brown's review in early November of 2017 confirmed the available medical records supported a finding of continued impairment, and Dr. Bomar acknowledged also that the available records supported Dr. Whitaker's lifting restriction.

The Court's review of the administrative record reveals Copenhaver's condition had not improved by December 4, 2017, yet the records in Liberty's possession prior to December 4 were enough to constitute sufficient medical evidence of disability. Thus, the stated reason – that the lack of escalation in care somehow indicated Copenhaver could suddenly perform the substantial and material duties of his job on a full time basis lacks support in the record. Nor is it a requirement for a finding of disability under the plain meaning of the Plan's terms.

### C.   Medical Documentation

Under the terms of the STD Plan, Liberty may discontinue benefits if Copenhaver was no longer able to provide sufficient medical evidence of disability. But it is not clear why the medical documentation received as of December 4, 2017, was insufficient. Liberty had in its possession at that time Dr. Whitaker's latest treatment note dated October 25, 2017. If Liberty needed additional medical documentation on or before December 4, 2017, Liberty failed to clearly communicate such a requirement. Liberty's

**MEMORANDUM DECISION AND ORDER  - 28**

November 10, 2017 letter extending benefits through December 4, 2017, indicated only that "additional written medical documentation will be required," but failed to specify what, specifically, was required, and indicated only that lack of "sufficient medical evidence…*may* result in the denial of further benefits." (AR 487.) Dr. Whitaker's treatment notes in Liberty's possession indicated he was to see Copenhaver on or before December 10, 2017,[14] inferring there may not have been a need for more frequent doctor visits or physician monitoring than what was occurring.

A plan administrator is required to explain why it believes a claimant's submitted medical evidence is inadequate. *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 870 (9th Cir. 2008) (requiring insurers to engage in a meaningful dialogue and give the beneficiary a description of any additional material or information necessary for him or her to perfect the claim and to do so in a manner calculated to be understood by the claimant). Here, on the basis of medical records from Dr. Whitaker that recorded continuing care and a condition that may take considerable time to improve, and which were not significantly different from records upon which Liberty relied to approve and extend benefits, Liberty determined the records were insufficient without any explanation. While plan administrators are not required to "accord special weight to the opinions of the claimant's physician," they may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

---

[14] Copenhaver's next visit to Dr. Whitaker occurred on December 5, 2017. (AR 376.)

**MEMORANDUM DECISION AND ORDER  - 29**

### D.    Appeals

Liberty's March 9, 2018 letter denying Copenhaver's January 25, 2018 first level appeal contained similar reasons for discontinuing benefits. Specifically, Liberty cited Copenhaver's: (1) "sub-optimal treatment for [his] reported bilateral frozen shoulders"; and (2) lack of diagnostic test results, office treatment notes, treatment plans, or evaluations to support the severity of his condition or limitations preventing him from performing his job duties. Liberty indicated that, in the absence of sufficient medical documentation to support Copenhaver's inability to perform his job, Copenhaver did not "meet the definition of disability."

Again, the Court finds no "optimal treatment" provision contained in the STD Plan. And, Liberty fails to explain why the treatment records from Dr. Whitaker dated December 5, and 21, 2017, do not provide sufficient medical evidence that Copenhaver continued to be unable to perform his job duties. Dr. Whitaker's December 2017 notes indicate his treatment plan consisted of medication management and a home exercise program. Dr. Whitaker again noted Copenhaver's condition would take 18 – 24 months to improve, and that Copenhaver remained unable to perform the material duties of his job because of pain and decreased range of motion documented by examination findings. AR 468. It is not clear why further diagnostic workup would be necessary to sustain a finding that Copenhaver remained disabled under the terms of the STD Plan, when the results of Dr. Whitaker's examination findings reflected no change in Copenhaver's pain or range of motion, and thus no change in Dr. Whitaker's assessment of Copenhaver's inability to perform the requirements of his job. AR 376 – 377.

**MEMORANDUM DECISION AND ORDER  - 30**

Baxter's September 20, 2018 letter denying Copenhaver's June 21, 2018 second level appeal request is similarly deficient. The letter recites again that Copenhaver did not meet the definition of disability, because he did not engage in formal physical therapy. Specifically, Baxter concluded Copenhaver had not provided records of "regular, appropriate, effective treatment for his condition." AR 136. However, Baxter does not explain why Dr. Whitaker's home exercise program was insufficient, nor does the Plan, as explained above, contain an "optimal" treatment standard. Treatment notes from Dr. Whitaker dated February 8, 2018, indicate Copenhaver was diligently performing his home exercise program, with no change in his range of motion, and thus remained unable to lift on a repetitive basis.

Baxter asserts again on second level review that the absence of a change in or escalation of his treatment indicated a lack of severity or intensity of symptoms. But Baxter does not explain why an escalation in treatment or symptoms is necessary to sustain a finding that Copenhaver continued to be disabled under the terms of the Plan, when his condition had not improved despite following Dr. Whitaker's treatment recommendations. The results of the IME performed by Dr. Bates on June 4, 2018, confirmed the lack of improvement in Copenhaver's condition since December of 2017, yet Baxter failed to account for this evidence.

Baxter cites also that there were no tests performed since December 4, 2017, to confirm Copenhaver's self-reported symptoms. This reason was not previously stated in Liberty's prior two letters. Further, it is not clear what tests Baxter required to confirm Copenhaver's condition when Liberty had determined Copenhaver met the eligibility

**MEMORANDUM DECISION AND ORDER  - 31**

criteria under the terms of the STD Plan between August 1, 2017 and December 4, 2017, based upon provider treatment notes and physical examinations. *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871-72 (9th Cir. 2008) (an administrator that adds, in its final decision, a new reason for denial contravenes the purpose of ERISA). Further, Dr. Bates' IME provided objective evidence based upon a functional capacity examination documenting Copenhaver's self-reported symptoms, one of which was his inability to lift objects greater than 20 pounds.

Finally, Baxter concludes the evidence provided in support of the second level appeal is "not sufficient to establish that the severity of [] Copenhaver's condition precluded him from performing his job duties after December 4, 2017." AR 136. Baxter's explanation is deficient. Copenhaver's job required him to lift heavy objects. Dr. Bates' IME confirmed there had been no change in Copenhaver's condition due to "prominent restrictions in the range of motion" in his shoulders. AR 418 – 419. Dr. Bates provided similar work restrictions as had Dr. Whitaker back in December of 2017. In other words, objective medical evidence confirmed that, since December 4, 2017, Copenhaver was unable to lift heavy objects due to restricted range of motion in his bilateral shoulders.

The Court is left with a definite and firm conviction that a mistake was committed, and finds Defendants' determination in December of 2017 and thereafter that Copenhaver did not meet the definition of disability under the terms of the STD Plan constituted an abuse of discretion. Defendants' reasons for discontinuing STD benefits lack support in light of the treating physician reports, and Defendants construed the language of the Plan in a manner conflicting with its plain language.

**MEMORANDUM DECISION AND ORDER - 32**

Copenhaver met the definition of disability. Copenhaver sought treatment from Dr. Whitaker at regular intervals between September 20, 2017, and February 8, 2018. He was therefore under the regular care of a licensed physician.

Copenhaver's job required him to lift objects 25 – 37 pounds or more on a repetitive basis. Liberty determined Copenhaver could not perform the material functions of his job based on the reports of treatment providers after performing physical examinations, and approved benefits up through December 4, 2017. Treatment records received after December 4, 2017, which included Dr. Bates' June 4, 2018 IME report and Dr. Whitaker's treatment notes, reflected no change in Copenhaver's condition after December 4, 2017. These records confirmed Copenhaver continued to suffer from restricted range of motion precluding repetitive lifting. The treatment records received after December 4, 2017, were not materially different than records received prior to that date, and upon which Liberty relied to approve STD benefits.

Last, Dr. Whitaker's treatment notes reflected Copenhaver followed a prescribed treatment plan and home exercise program. The Plan does not contain an "optimal" treatment provision. Copenhaver therefore met the eligibility criteria under the terms of the STD Plan, as those terms are understood in their plain, ordinary sense.

## CONCLUSION

For the reasons discussed above, the Court concludes that Defendants' decision was not supported by substantial evidence and that Defendants abused their discretion when they discontinued Copenhaver's STD benefits. Accordingly, Defendants' motion for summary judgment will be denied, and Plaintiff's motion for partial summary judgment will be granted.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Defendants' Motion for Summary Judgment (Dkt. 23) is **DENIED.**

2) Plaintiff's Motion for Partial Summary Judgment (Dkt. 25) is **GRANTED**.

DATED: July 27, 2020

Candy W. Dale
U.S. Magistrate Judge